**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| SHERI BUTLER BROCKINGTON, on behalf of herself and others similarly situated, | : | CIVIL ACTION FILE NO. 26-cv-65 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SWEET EMMALINE CHEESECAKES FRANCHISE, LLC | : | |
| | : | |
| Defendant. | : | |
| _____ / | | |

## **PLAINTIFF'S OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS**

<u>**INTRODUCTION**</u>

A 1991 law that bars vehicles from a park applies equally to Cybertrucks and to sedans, even though the former didn't exist at the time. So, too, here: The Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. ("TCPA") prohibits sending text messages to phone numbers on the national Do Not Call List, just as it prohibits traditional voice calls.

While alpha-numeric text messaging existed in the context of mobile paging devices, text messaging on cellular telephones was not as mainstream as it is today when the TCPA was passed in 1991. But no matter: As both courts and the FCC have long recognized, the plain meaning of the word "call" in the TCPA encompasses any "communication used primarily between telephones," regardless of whether that "call" is communicated by "voice" or "text message." *Howard v. Republican Nat'l Comm.*, 164 F.4th 1119, 1123–24 (9th Cir. 2026) (quoting *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009)); *see* 18 FCC Rcd. 14014, 14115 ¶ 165 (2003). The TCPA's Do Not Call List rules therefore apply to text messages, and private individuals may enforce those rules in court. *See, e.g.*, *Esquivel v. Mona Lee, Inc.*, 2025 WL 3275607, at *2–3 (S.D. Cal. 2025); *Mujahid v. Newity, LLC*, 2025 WL 3140725, at *2–3 (N.D. Ill. 2025); *Wilson v. Medvidi*, 2025 WL 2856295, at *2–4 (N.D. Cal. 2025); *Wilson v. Skopos Fin., LLC*, 2025 WL 2029274, at *4–5 (D. Or. 2025).

The structure and purpose of the TCPA's Do Not Call List provisions confirm that interpretation. The Do Not Call List exists "to protect residential telephone subscribers' privacy rights"—which are invaded by text messages no less than by voice calls. 47 U.S.C. § 227(c)(1); *see Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1008–09 (N.D. Ill. 2010). The statute directs the FCC to prohibit "telephone solicitations" to listed numbers, a term that is defined by the statute to include any "call or message … which is transmitted to any person" with a commercial purpose—broadly inclusive language that encompasses text messages even

1

more clearly than the word "call" does standing alone. 47 U.S.C. § 227(a)(4); *see Medvidi*, 2025 WL 2856295, at *3; *Mujahid*, 2025 WL 3140725, at *2. And, anyway, the statute's Do Not Call List provisions expressly delegate "flexibility" to "fill up the details" to the FCC. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024); *see* 47 U.S.C. § 227(c)(3)(A), (E). So, any doubt on this question should be resolved in favor of deference to the agency's longstanding reasonable judgment. *See Skopos Fin.*, 2025 WL 2029274, at *4.

Defendant's motion to dismiss argues otherwise, insisting that because text messages didn't exist when the TCPA became law, the TCPA cannot cover texts. But although "every statute's *meaning* is fixed at the time of enactment," there is nothing odd about old text finding "new *applications*" as times change. *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018). It also doesn't matter that no one would describe a text message as a "telephone call" in "today's parlance." That's not, however, how statutory interpretation works. Courts look to a statute's ordinary "meaning at the time of … adoption" to interpret the law, not "modern intuitions." *New Prime, Inc. v. Oliveira*, 586 U.S. 105, 114 (2019). In fact, modern conversational parlance can be downright misleading when times have changed. *See id.* at 114–16.

Sweet Emmaline's reading has other problems, too. It hinges on a single use of the word "call" in section 227(c)(5), which creates a private right of action to enforce the FCC's Do Not Call List rules. Yet the company cannot explain why the reference in the private-action provision should be construed more narrowly than the Do Not Call List rules that it exists to enforce. It also cannot explain why the word "call" would have a different meaning there than it has in the TCPA's nearby autodialer provisions. The meaning of "call" is even clearer in that part of the statute, where Congress used "call" to describe written messages received on a pager—the most analogous technology to cellular telephone text messaging that was prevalent in 1991. *See*

47 U.S.C. § 227(b)(1)(A)(iii). If a text "call" to a pager can violate the TCPA, a text "call" to a cell phone can too. *See Lozano*, 702 F. Supp. 2d at 1004–05.

Once Sweet Emmaline's flawed interpretation of the statute is set straight, the analysis here is straightforward: Plaintiff received multiple unwanted marketing texts from Sweet Emmaline within two weeks, and those texts indisputably violated the FCC's Do Not Call List rules. *See* 47 C.F.R. § 64.1200(c)(2), (e). The Plaintiff therefore "received more than one telephone call within any 12-month period … in violation of the regulations," and may sue to enforce her "privacy rights to avoid receiving telephone solicitations" that she does not want. 47 U.S.C. § 227(c)(1), (5).

## BACKGROUND

### A. Legal Background

Section 227(c) of the Telephone Consumer Protection Act empowers the FCC to decide whether to create a national Do Not Call List, and to determine the rules that will govern it. *See* 47 U.S.C. § 227(c)(1)–(4).

The guiding purpose of a Do Not Call List is "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." *Id.* § 227(c)(1). The key operative term there is "telephone solicitations," which are defined in the TCPA as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods or services, which is transmitted to any person." *Id.* § 227(a)(4). As one court recently observed, that definition is "more concerned with the purpose of the telephone communications [that are prohibited] than the form in which those communications are transmitted." *Wilson v. Medvidi, Inc.*, 2025 WL 2856295, at *3 (N.D. Cal. 2025)*; see, e.g.*, *Hulce v. Zipongo Inc.*, 132 F.4th 493, 497–500 (7th Cir. 2025) (Do Not Call List liability turned on whether a text message had the requisite commercial purpose).

3

Case 1:26-cv-00065-TRM-MJD    Document 15    Filed 06/09/26    Page 4 of 26    PageID #: 58

The statute grants the FCC broad discretion to determine the rules governing the Do Not Call List. The statute expressly empowers the FCC to make rules "that the Commission determines are most effective and efficient to accomplish the purposes of this section." 47 U.S.C. § 227(c)(1)(E) (emphasis added). And it directs the FCC to evaluate alternative approaches based on open-ended criteria such as their "effectiveness in protecting … privacy rights" and their "other advantages and disadvantages." *Id.* § 227(c)(1)(A).

Any Do Not Call List regulations that the FCC establishes must meet certain statutory criteria. *See id.* § 227(c)(3)–(4). For example, the rules must require phone companies to notify their subscribers about the Do Not Call List, and must specify how frequently the list will be updated. *Id.* § 227(c)(3)(B), (c)(3)(I). And—as relevant here—the statute specifies that the FCC's rules must "prohibit any person from making or transmitting a telephone solicitation to the telephone number of any subscriber" on the national Do Not Call List. *Id.* § 227(c)(3)(F).

Finally, section 227(c)(5) provides for private enforcement of the FCC's Do Not Call List rules. That provision grants an express private right of action to any "person who has received more than one telephone call within any 12-month period … in violation of the regulations." 47 U.S.C. § 227(c)(5). That is "a straightforward provision designed to achieve a straightforward result"—to enable "each person to protect his own personal rights" under the Do Not Call List rules. *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 650 (4th Cir. 2019).

The FCC's implementing regulations for the Do Not Call List include 47 C.F.R. § 64.1200(c)(2), which generally prohibits "any telephone solicitation to … [a] residential telephone subscriber who has registered his or her telephone number" on the Do Not Call List. The FCC has also determined in a series of orders and, more recently, in a formal regulation, that this rule applies to "calls or text messages to wireless telephone numbers." 47 C.F.R.

4

§ 64.1200(e).

### B. Factual Background

Plaintiff Sheri Butler Brockington acquired her cellular telephone number, (423) 718-XXXX, in December 2023 and has used it exclusively for personal, residential, and household purposes since that time. Compl. ¶¶ 14–16, ECF No. 1. Plaintiff does not use the number for business purposes, does not include it in business or marketing materials, and is not reimbursed by any business for her cellular service. *Id.* ¶¶ 16, 21.

Plaintiff alleges that her telephone number has been listed on the National Do Not Call Registry since 2013. *Id.* ¶ 17. She further alleges that she does not maintain a landline telephone number and instead uses her cellular telephone in the same manner that one would use a residential landline telephone. *Id.* ¶¶ 18–20.

Plaintiff alleges that she never sought out or solicited information regarding Sweet Emmaline's products or services before receiving the communications at issue. *Id.* ¶ 22. Nevertheless, Plaintiff alleges that Sweet Emmaline sent her multiple telemarketing text messages promoting its products and services, including messages in June 2024 and March 2025. *Id.* ¶ 23. Screenshots attached to the Complaint depict promotional messages advertising discounts and encouraging recipients to visit Sweet Emmaline's business. *Id.* ¶¶ 23–24.

Based on these allegations, Plaintiff brings this action individually and on behalf of a proposed nationwide class of persons who allegedly received more than one telemarketing voice message or text message from Sweet Emmaline while their telephone numbers were registered on the National Do Not Call Registry. *Id.* ¶ 26.

<h1 style="text-align:center"><u>ARGUMENT</u></h1>

**I.      Text Messages are Considered "Calls" under the TCPA.**

Sweet Emmaline Health contends that a single use of the word "call" in section 227(c)(5)'s private right of action means that the Do Not Call List rules cannot apply to text messages. That's incorrect.

Moreover, because section 227(c) is structured as an express delegation of discretionary authority to the FCC, any doubt about the answer here simply means that Congress intended the agency's reasonable judgment to control.

Post *McLaughlin* and *Loper Bright*, the majority of courts have concluded that under the TCPA text messages are calls. Indeed, courts in more than thirteen districts and the only circuit court to directly address the issue, the Ninth Circuit, have held the DNCR provision covers text messages. *See Howard v. Republican Nat'l Comm.*, 164 F.4th 1119 (9th Cir. Jan. 13, 2026) (reaffirming text messages are "calls" post *Jones*). The Supreme Court has also weighed in on the issue in the context of the TCPA's robocalls provision. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call.'").

**A. The Do Not Call List provisions in TCPA section 227(c) authorize the FCC to prohibit text messages.**

**i.      The plain meaning of the word "call" includes text messages**

To interpret a statutory term, courts "look to the meaning of the word at the time the statute was enacted, often by referring to dictionaries." *Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 863 (7th Cir. 2016). Courts have long recognized that the word "call" in the TCPA refers to any attempt to communicate by telephone, including text messages. That's because the contemporaneous

6

"plain and ordinary meaning in this context" of "the statutory term 'call'" is "to communicat[e] with or an attempt to get in communication with a person by telephone." *Howard*, 164 F.4th at 1123–24 (quoting *Satterfield*, 569 F.3d at 953–54 & n.3 and *Webster's Third New International Dictionary* (1981 ed.)).

This basic definition of the word "call," which is the relevant one given the context and the word's pairing with "telephone" in section 227(c)(5), appears in many dictionaries from around the time of the TCPA's passage. *See, e.g.*, *Random House Webster's College Dictionary* (1991) ("to communicate or try to communicate with by telephone"); *Oxford English Dictionary* (2d ed.1989) ("a summons or communication by telephone"). "The contemporary definition of "telephone call" was therefore not limited to oral or vocal communications. It encompassed any communication made using a telephone." *Wilson v. Better Mortgage Corp.*, 2025 WL 3493815, *5 (S.D.N.Y. Dec. 5, 2025).

And courts have long recognized that the definition identified in *Satterfield*—any attempt to communicate with someone by telephone—is the meaning of "telephone call" that Congress would have intended in 1991, when the TCPA was enacted. *See, e.g.*, *Ashland Hosp. Corp. v. Serv. Emps. Int'l Union, Dist. 1199 W.V./Ky./Oh.*, 708 F.3d 737, 742 (6th Cir. 2013); *Wilson*, 2025 WL 3493815 *5; *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1007 (N.D. Ill. 2010); *Sagar v. Kelly Auto. Grp.*, 2021 WL 5567408, at *4 (D. Mass. 2021); *Schaevitz v. Braman Hyundai, Inc.*, 437 F. Supp. 3d 1237, 1247 (S.D. Fla. 2019). Texting is, of course, a means of communicating with someone by telephone. (Sweet Emmaline hasn't disputed that a text is a "telephone" communication; of course it is.) So text messaging plainly fits within that literal definition of a 'call,' because 'text messaging is a form of communication used primarily between telephones.'" *Howard*, 164 F.4th at 1123–24 (quoting *Satterfield*, 569 F.3d at 954)).

The established definition of "telephone call" in the TCPA therefore readily encompasses texts. *See, e.g., id.*, *Lozano*, 702 F. Supp. 2d at 1007; *Wilson v. Medvidi*, 2025 WL 2856295, at *2 (N.D. Cal. 2025); *Mujahid v. Newity, LLC*, 2025 WL 3140725, at *2 (N.D. Ill. 2025). Both the Ninth and Seventh Circuits have said, in cases alleging violations of section 227(b), that "[t]ext messages to a cellular telephone qualify as a 'call' within the meaning of the statute." *Warciakv. Subway Rests., Inc.*, 949 F.3d 354, 356 (7th Cir. 2020); *see Howard*, 164 F.4th at 1123–24; *Satterfield*, 569 F.3d at 954. Other courts, too, have "routinely found that the phrase 'call' in subsection (b) … includes text messages." *Hudson v. Palm Beach Tan, Inc.*, 2024 WL 4190513, at *7 n.6 (M.D.N.C. 2024). And, absent contrary evidence, a statutory word or phrase is presumed to bear a consistent meaning throughout a statute. *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 85 (2017). So the consensus meaning of the word "call" in section 227(b), as encompassing texts, "supports the interpretation that the term 'call' as used in § 227(c) also encompasses 'text messages.'" *Mujahid*, 2025 WL 3140725, at *2.

The meaning of the word "call" is especially clear in the nearby autodialer provisions in section 227(b) of the original TCPA. The word "call" is used extensively in those provisions prohibiting automatic dialing technology and robocalls. Most notably, section 227(b) prohibits using autodialer or robocall technology "to make any call … to any telephone number assigned to a paging service." 47 U.S.C. § 227(b)(1)(A)(iii). A typical paging device in the early 1990s would have displayed an incoming message as written text—usually displaying a phone number to call. So the use of the word "call" in connection with pagers in section 227(b) establishes "that the term 'call' cannot invoke only the common usage … in which a 'call' refers to oral communication between two parties via telephone." *Lozano*, 702 F. Supp. 2d at 1005; *see also Abbas v. Selling Source, LLC*, 2009 WL 4884471, at *4 (N.D. Ill. 2009).

Defendant argues that cases such as *Satterfield*, *Warciak*, and *Howard* are distinguishable because they arose under § 227(b) rather than § 227(c). That distinction is immaterial. The question in those cases was the meaning of the same statutory term—"call"—used elsewhere in the TCPA. And "identical words used in different parts of the same statute are generally presumed to have the same meaning." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 85 (2017). Sweet Emmaline identifies no textual basis for giving the word "call" one meaning in § 227(b) and a different meaning in § 227(c)(5). To the contrary, the consistent-usage canon strongly supports applying those courts' interpretation of "call" here. Likewise, the court in Better Mortgage concluded that "the weight of the authority concerning § 227(b) strongly suggests that § 227(c)'s parallel usage of 'telephone call[s]' applies to text messages."

### ii. Courts Within the Sixth Circuit Consistently Treat Text Messages as Calls Under the TCPA.

The Sixth Circuit has expressly recognized that text messages constitute "calls" under the TCPA. In *Keating v. Peterson's Nelnet, LLC*, the court addressed unsolicited text-message advertising sent to cellular telephones and held that the FCC reasonably interpreted the TCPA's prohibition on unauthorized calls to encompass text messages. The Court explained:

> "We thus unhesitatingly afford deference to the agency holding that a text message should be treated as a 'call' for purposes of the TCPA." *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 371 (6th Cir. 2015).

Nor does the Sixth Circuit's reliance on FCC guidance in *Keating* alter this analysis. Even setting the FCC's interpretation aside, the ordinary meaning of the term "call," the technological context existing when Congress enacted the TCPA, the statute's structure, and the consistent understanding reflected in decades of judicial decisions all support treating text messages as calls under the TCPA. The FCC's interpretation therefore confirms, rather than creates, the conclusion that text messages fall within the scope of the statute.

9

Federal district courts throughout the Sixth Circuit have followed the same understanding. In *Barnett v. First National Bank of Omaha*, a Kentucky federal court summarized Sixth Circuit law by stating that "[t]he Sixth Circuit treats text messages as calls under the TCPA." 2022 U.S. Dist. LEXIS 37563, at *5. The Court treated that proposition as settled circuit law. Likewise, in *Silbaugh v. Viking Magazine Services*, an Ohio federal court stated directly that "[a] text message is a call under the TCPA." 278 F.R.D. 389, 390 (N.D. Ohio 2012).

Courts in Tennessee have proceeded from the same premise. In *Cunningham v. Enagic USA, Inc.*, the Middle District of Tennessee repeatedly treated text messages and telephone calls as parallel forms of actionable TCPA communications. The court described allegations involving "multiple telephone calls" and "multiple text messages" to a cellular phone and analyzed those communications together under the TCPA, including claims brought under § 227(c)(5). The plaintiff likewise sought statutory damages for each "telephone call and text" received. Although *Cunningham* did not squarely address the statutory-interpretation question presented here, it reflects the settled understanding within this District that text messages are actionable TCPA communications.

Taken together, these authorities demonstrate that courts throughout the Sixth Circuit—including courts in Tennessee—have long treated text messages as calls for purposes of the TCPA. Sweet Emmaline's contrary interpretation would place this Court at odds not only with FCC guidance, but with the settled understanding reflected in Sixth Circuit and Tennessee TCPA jurisprudence.

        **iii.**    **Congress used the term "call" broadly when it enacted the TCPA, and pre-1991 technologies confirm that text-based telephone communications were understood as "calls"**

The Defendant's position also assumes, wrongly, that "telephone call" in 1991 could only have meant voice communication because text messaging, in its current form, did not exist in 1991. But closely analogous predecessor technologies *did* exist in 1991. Text-based telephone communication predates the TCPA by decades, and Congress expressly recognized that text communications could take the form of "call[s]" one year before passing the TCPA. The Americans with Disabilities Act of 1990 uses the word "call" throughout its text to refer to telephone calls placed using a telephone relay operator, in which an operator types the other side's speech into a TTY/TDD device for a deaf individual to read. Congress explicitly required telephone companies to deliver such text-based telephone calls for the deaf on equal footing with voice services. Throughout the ADA, Congress repeatedly referred to those text-based communications as "calls," including in the relay-records limitation, which restricts text record retention beyond "the duration of the *call*." 47 U.S.C. § 225(d)(5) (emphasis added).

That statutory backdrop is dispositive. Congress drafted the TCPA against a legal regime in which it had just told the FCC and the telephone industry that text-based telephone communications were "calls." 47 U.S.C. § 225. Nor was Congress using the term "call" casually in the ADA. Congress repeatedly employed that term when describing telecommunications relay services and TTY/TDD communications, demonstrating that it understood a telephone "call" to encompass communications transmitted through telephone networks even where no spoken words were exchanged between the parties. Because Congress enacted the TCPA only one year later, the Court should presume that Congress used the same term consistently across closely related telecommunications statutes enacted during the same period. The Court should presume that Congress understood the very word it used. To read "telephone call" in § 227(c)(5) as encompassing only voice calls would mean that, even in 1991, deaf and hard-of-hearing

11

Americans making TTY/TDD-relayed text telephone calls were not receiving "telephone calls" at all. That cannot be squared with the ADA, and it cannot be squared with the 1991 dictionaries set out above.

### iv. Congress's later amendments to § 227(e) do not narrow § 227(c).

A centerpiece of the statutory argument proffered by the Defendant is that Congress's later use of "text message" in § 227(e) shows Congress understood "telephone call" elsewhere in the TCPA to exclude texts. The argument has surface textualist appeal. On close examination, however, it cuts decisively the other way. Two points compound to defeat it.

*First*, § 227(e)(8) defines its terms "[f]or purposes of this subsection." 47 U.S.C. § 227(e)(8). That subsection-specific definition does not purport to limit the use of the word "call" elsewhere in § 227, including § 227(c). *See Wilson v. Easy Spirit, LLC*, No. 3:25-CV-112 (SFR), 2026 WL 884170, at *7 (D. Conn. Mar. 31, 2026); *Rubin v. Staples, Inc.*, No. 2:25-15515 (WJM), 2026 WL 881651, at *6 (D.N.J. Mar. 31, 2026).

*Second*, and decisively, the 2018 amendments were enacted when *Chevron* existed. When Congress drafted § 227(e), the FCC's interpretation that the word "call" included text messages was not merely persuasive guidance, it was *binding* on the courts under *Chevron* and the provisions of the Hobbs Act. *See, e.g.*, *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1121 (11th Cir. 2014) ("[T]he district court lacked the power to review the validity of the FCC's interpretation . . . ."); *Satterfield*, 569 F.3d at 952 (deferring to FCC under *Chevron* to hold texts are "calls"). Under a pre-*Loper Bright* regime, the FCC had already conclusively interpreted "call" in the TCPA to include text messages, and had done so as early as 2003. *See* 18 FCC Rcd. 14014, 14115-16 (2003).

12

Against that backdrop, Congress's drafting choices in 2018 send the *opposite* signal from the inference the authorities Defendant's cites draw. Congress did not need to add "text message" to § 227(c) to bring texts within § 227(c)(5) because the FCC *already had done so*, and under *Chevron*, courts were bound to follow that interpretation. If Congress had *disagreed* with the FCC's reading that the term "call" encompassed text message calls, the natural and obvious move would have been to amend the statute to *reject* that binding interpretation. Congress did the opposite. It amended an adjacent subsection while expressly preserving FCC rules and orders. That is acceptance of the FCC's rulemaking. As Judge Gettleman explained:

> Defendant correctly observes that Congress most recently amended the TCPA in 2018. The regulatory history and case law discussed above occurred prior to 2018. Thus, in 2018 it would have been known to Congress that the courts and the FCC were both consistently interpreting § 227(c) to include text messages.
> That Congress did not change anything about § 227(c) in the 2018 amendments can be read to represent exactly the opposite of what defendant advocates. In light of the regulatory history and case law that was known to Congress in 2018, Congress had the option to take affirmative action to exclude text messages from § 227(c)'s coverage. Congress did not do so. If Congress's inaction in 2018 is to be ascribed any meaning, the court interprets it as an acceptance of the existing case law and regulations that applied § 227(c) to text messages. This read on Congress's inaction is in harmony with the oft-repeated principle that statutory stare decisis is particularly strong, because Congress can change what the courts have concluded.

*Rabbitt v. Rohrman Midwest Motors, Inc.*, No. 25 C 11312, 2026 WL 851279, at *4 (N.D. Ill. Mar. 27, 2026).

The Supreme Court itself forecloses any contrary reading. *Loper Bright* itself expressly declined to "call into question prior cases that relied on the *Chevron* framework," explaining that the "holdings of those cases that specific agency actions are lawful . . . are still subject to statutory *stare decisis* despite [our] change in interpretive methodology." 603 U.S. at 376. "Mere reliance on *Chevron* cannot constitute a special justification for overruling such a holding." *Id.* (cleaned up). The Eleventh Circuit has

13

already remarked on this limit. Although *Loper Bright* opens the door to new challenges based on new agency actions interpreting statutes, it forecloses new challenges based on specific agency actions that were already resolved through a *Chevron* deference analysis. *See Bastias v. U.S. Att'y Gen.*, 158 F.4th 1188, 1195 (11th Cir. 2025) (Newsom, J., concurring) (citing *Tennessee v. Becerra*, 131 F.4th 350 (6th Cir. 2025)). The Ninth and Second Circuits have agreed that *Loper Bright* provides no basis for disregarding prior circuit precedent that had rested on *Chevron*-era deference of a challenged regulation. *Lopez v. Garland*, 116 F.4th 1032, 1045 (9th Cir. 2024); *Garcia Pinach v. Bondi*, 147 F.4th 117, 121 (2d Cir. 2025).

Properly applied here, that doctrine is dispositive. When Congress enacted the 2018 amendments, the FCC's interpretation was a specific agency action upheld by multiple circuit courts of appeal under *Chevron* and was the law of the land. Statutory *stare decisis* preserves it. *Loper Bright*, 603 U.S. at 376. And the inference the aforementioned authorities incorrectly drew from Congress's silence in § 227(c) runs precisely *opposite* to historical reality. At the very least, it defeats Defendant's inference that Congress's failure to amend § 227(c)(5) silently rejected the notion that it did not cover text message calls. In the *Chevron* era, congressional silence in the face of a settled, binding agency interpretation was acceptance of that interpretation, not implicit disapproval. Defendant would have this Court draw the *opposite* inference, an inference that *Loper Bright* itself forecloses.

**B. That interpretation of the word "call" aligns section 227(c)'s private right of action with its substantive provisions.**

Much of Sweet Emmaline's argument focuses on the single use of the word "call" in

14

section 227(c)(5). But reading section 227(c)(5)'s private right of action in context with the substantive Do Not Call List provisions of section 227(c) further confirms that text messages are covered.

To see why, start with the core of section 227(c)—its prohibition on "making or transmitting a telephone solicitation to the telephone number of any subscriber" on the Do Not Call List. 47 U.S.C. § 227(c)(3)(F). Text messages, of course, are "ma[de] or transmitt[ed]" to a "telephone number." *Id.* And it is well-established that the residential telephone "subscriber[s]" protected by the Do Not Call List include cell phone subscribers: The FCC determined that cell phone subscribers are covered when it first created the Do Not Call List rules, *see* 18 FCC Rcd. 14014, 14037–39 ¶¶ 33–36 (2003), and courts have overwhelmingly agreed with that interpretation of the statute ever since, *see, e.g.*, *Harriel v. Bealls, Inc.*, 2025 WL 2379617, at *2 (M.D. Fla. 2025); *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 203 & n.4 (S.D.N.Y. 2024) (collecting cases).

The term "telephone solicitation" also clearly encompasses text messages. The statute expressly defines a "telephone solicitation" to mean "a telephone *call or message* … which is transmitted to any person" for commercial purposes, with certain exceptions not relevant here. 47 U.S.C. § 227(a)(4) (emphasis added). A text message, no less than a voice call, can be "transmitted." *See, e.g.*, *Transmit*, *Random House Webster's College Dictionary* (1991) ("to send a signal by radio waves or by wire"). And the reference to a "call or message" covers texts even more clearly than the word "call" standing alone. As explained above, "the ordinary, contemporary, and common meaning" of the word "call" in the TCPA includes text messages. *Satterfield*, 569 F.3d at 953–54 & n.3; *see supra*, Part I.A. And contemporary definitions of the word "message" do too—a message in 1991 was "[a]ny notice, word, or communication, *no*

*matter the mode and no matter how sent.*" *Message*, *Black's Law Dictionary* (6th ed. 1990) (emphasis added).[1] So "call" and "message" both describe communication with a phone, and neither differentiates between oral and written mediums.

Finally, the purpose of the Do Not Call List provisions further supports that interpretation. Congress's stated goal was "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). "[A] voice message or a text message are not distinguishable in terms of being an invasion of privacy." *Satterfield*, 569 F.3d at 954;  *accord Howard*, 164 F.4th at 1124; *Mujahid*, 2025 WL 3140725, at *2; *Medvidi*, 2025 WL 2856295, at *3; *Wilson v. Skopos Fin., LLC*, 2025 WL 2029274, at *4 (D. Or. 2025). Indeed, nothing in the statute gives any suggestion that Congress thought "oral messages were more invasive or objectionable than written ones." *Medvidi*, 2025 WL 2856295, at *3.

### C. Sweet Emmaline's arguments for a narrower interpretation are unpersuasive.

Sweet Emmaline would have this Court interpret the Do Not Call List provisions more narrowly, insisting that the word "call" in section 227(c)(5) can only mean an "auditory communication[]," and therefore the statute categorically excludes text messages. The cases it asserts show support for its arguments are mainly three district court cases, *Jones v. Blackstone Medical Services*, 792 F. Supp. 3d 894 (C.D. Ill. 2025)—which is currently on appeal before the Seventh Circuit—*Davis v. CVS Pharmacy, Inc.*, 2025 WL 2491195 (N.D. Fla. 2025) and *El Sayed v. Naturopathica Holistic Health, Inc.*, 2025 WL 2997759, at *2 (M.D. Fla. Oct. 24, 2025). But

---

[1] *See also, e.g.*, *Message*, *Random House Webster's College Dictionary* (9th ed. 1991) ("a communication delivered *in writing*, speech, by means of signals, etc.") (emphasis added); *Message*, *Oxford English Dictionary* (2d ed. 1989) ("an oral *or written* communication sent from one person to another") (emphasis added).

16

none of the arguments made by Sweet Emmaline or in those cases are persuasive.

Consider first how Sweet Emmaline reads the word "call" in section 227(c)(5). It repeats a few basic arguments for reading that word as implicitly limited to voice calls. But all of them go about interpreting the statute wrong.

First, Sweet Emmaline (parroting *Jones*) insists that "call" cannot encompass text messages because "in 1991," "text messages did not exist." (*Jones*, 792 F. Supp. 3d at 899 ("Text messaging was not an available technology in 1991)); *see id.* at 33 (quoting *El Sayed*, 2025 WL 2997759, at *3 for "observ[ing] that 'in common American English usage, a "telephone call" and a "text message" are separate and distinct forms of communication'"). That's not how statutory interpretation works. It's true that text messaging was not mainstream in 1991. *See Medvidi*, 2025 WL 2856295, at *2. But, it is black-letter law that statutes are not "confined to the particular applications contemplated by the legislators." *Diamond v. Chakrabarty*, 447 U.S. 303, 315–16 (1980) (collecting cases). Instead, "statutes must be permitted to apply to technologies not in existence when a statute was drafted." *Lozano*, 702 F. Supp. 2d at 1008.

There's nothing unusual about that. "While every statute's *meaning* is fixed at the time of enactment," it is commonplace that "new *applications* may arise in light of changes in the world." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018). As Judge Easterbrook explained, statutory terms generally identify a class of things rather than a specific technology. Thus, technological evolution does not remove a new device from an existing statutory category when it performs the same core function. *In re Erickson,* 815 F.2d 1090, 1092–93 (7th Cir. 1987).

The same is true here. "In determining whether section 227(c) applies to text messages, the Court looks to the plain meaning of the text rather than the specific facts or technology that Congress may have had in mind in 1991 at the time of the TCPA's passage." *Medvidi*, 2025 WL

17

2856295, at *2. The 1991 meaning of "telephone call"—which "refers to both oral and written communications"—is what matters. *Id.*; *see Lozano*, 702 F. Supp. 2d at 1007. Applying Judge Easterbrook's analysis to section 227(c)(5), a court recently explained that, "[j]ust as a mower that both cuts and conditions hay is still a mower, a telephone which communicates texts and voice is still a telephone." *Alvarez v. Fiesta Nissan, Inc.*, 2026 WL 202930, at *5 (S.D. Tex. Jan. 26, 2026). "Thus, to make a 'telephone call,' for purposes of § 227(c)(5), is 'to get into communication' with" a "telephone," no matter if through oral or written communication. *Id.* And that remains true even if text messages were not the "particular manifestation of [the] problem" that Congress had front of mind when it was legislating. *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 665 (D.C. Cir. 2009); *see Diamond*, 447 U.S. at 315; *Hively*, 853 F.3d at 344–45. "[T]he fact that text messages had not yet been invented when Congress wrote the TCPA does not foreclose that it intended for the statute to cover future technology." *Wilson v. Better Mortg. Corp.*, No. 25 CIV. 5503 (PAE), 2025 WL 3493815, at *5 (S.D.N.Y. Dec. 5, 2025).

Next, Sweet Emmaline argues that a text message is not a "telephone call" in modern parlance. But modern usage is not the relevant inquiry. Courts interpret statutory language according to its ordinary meaning at the time of enactment, not according to contemporary linguistic conventions. *See New Prime, Inc. v. Oliveira,* 586 U.S. 105, 114–16 (2019). Thus, even if today's speakers commonly distinguish between calls and texts, the question is what "telephone call" meant when Congress enacted the TCPA in 1991. As explained above, contemporaneous dictionaries defined a telephone call broadly as an attempt to communicate by telephone, a definition that readily encompasses text messages. *See Howard,* 164 F.4th at 1123–24.

Sweet Emmaline's interpretation fares no better when it comes to the broader statutory context in which the word "call" in section 227(c)(5) appears. Sweet Emmaline barely engages

with the substantive Do Not Call List provisions of the statute in the remainder of section 227(c). That reading of the statute doesn't work. Sweet Emmaline fails to identify any reason Congress would have intended that odd result. And the text of section 227(c)(5) suggests otherwise—first, by being much more explicit about different ways that the private right of action actually is limited (requiring "more than one" call "within any 12-month period"); and, second, by linking the private right of action to "violation of the regulations prescribed under this subsection" (not any particular subset thereof). The reference to "violation of the regulations," in particular, suggests that section 227(c)(5) is simply "a straightforward provision designed to achieve a straightforward result"—making violations of the FCC's rules actionable. *See Krakauer*, 925 F.3d at 650.

If Congress wanted to limit *only* the private right of action in section 227(c)(5) to voice communications, implicitly doing so by using the word "call" would have been a strange way to go about it. After all, the word "call" *does* include textual communication in other provisions of the statute. If Congress intended to cabin section 227(c)(5)'s private right of action to *exclude* text messages, it wouldn't have done so by using a term that elsewhere *includes* them.

Because it's doubtful that Congress intended section 227(c)(5) to have a narrower scope than the Do Not Call List regulations it exists to enforce, the much better reading of "call or message" in section 227(a)(4) is that it instead signals Congress's intent to inclusively define the kinds of "telephone solicitations" that can be prohibited. The definition of "telephone solicitation" focuses not on a communication's form but on whether it has "the purpose of encouraging" various kinds of commercial transactions. 47 U.S.C. § 227(a)(4); *see, e.g.*, *Hulce*, 132 F.4th at 497–500 (Do Not Call List liability turned on whether a text message had the requisite commercial purpose).

19

At the same time, the statute uses broad and inclusive language to describe how such a communication might be conveyed—the FCC is directed to prohibit "making *or* transmitting" a telephone solicitation to "any" listed number, and a telephone solicitation is a "call *or* message" that is "transmitted to *any* person." 47 U.S.C. § 227(a)(4), (c)(3)(F) (emphases added). Congress presumably used all that broad and disjunctive language to capture a wide range of communication mediums, including text messages. *See Pepper v. GVG Cap. LLC*, 677 F. Supp. 3d 638, 643 (S.D. Tex. 2023) (rejecting an argument that "text messages are not actionable" under section 227(c) because it "fails in the face of the statutory text, which refers to 'telephone call[s] or message[s]'"). The statutory definition of "telephone solicitation" therefore "makes clear that Congress was more concerned with the purpose of the telephone communications … than the form in which those communications are transmitted." *Medvidi*, 2025 WL 2856295, at *3; *Mujahid*, 2025 WL 3140725, at *2 (same).

Sweet Emmaline also has no good answer for nearby uses of the word "call" in section 227(b), the autodialer provisions of the original TCPA. Indeed, the meaning of "call" is especially clear in section 227(b) because it's used there to describe a (typically text-focused) transmission to a "paging service." *See supra*, Part I.A.  Congress has even "ratified" the longstanding interpretation from "the FCC as well as myriad courts" that "telephone call" "in § 227(b) [] include[s] text messages." *Alvarez v. Fiesta Nissan, Inc.*, 2026 WL 202930 *6 (S.D. Tex. Jan. 26, 2026); *see Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act*, PL 116-105, December 30, 2019, 133 Stat 3274 (recognizing that text messages are covered in § 227(b) by providing for streamlined information sharing with the FCC relating to "a call made or a text message sent in violation of subsection (b)"). "Where, as here, Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it

20

with positive legislation, we cannot but deem that construction virtually conclusive." *Commodity Futures Trading Com v. Schor*, 478 U.S. 833, 846 (1986).

And reading the word "call" differently in section 227(c)(5) than in section 227(b) would make no sense. Absent good reason to think otherwise, "identical words used in different parts of the same statute" carry "the same meaning." *See Henson*, 582 U.S. at 85. As the FCC recently explained, it would be "anomalous" to give the word "call" a narrower meaning in section 227(c)(5) than it has elsewhere in the TCPA. 38 FCC Rcd. at 12257 ¶ 27. Congress would not have *excluded* text messages in section 227(c)(5) by using a term that in section 227(b) *includes* them. So "there is no reason to believe that ['call'] has a different meaning when used in the do-not-call provisions." *Dawson*, 2024 WL 4765159, at *5.

Nor is Sweet Emmaline right to assert that under section 227(e)(8), "call" and "text message" are "distinct." If anything, section 227(e)(8) actually reinforces that texts *are* calls in the lexicon of the TCPA. It describes a "text message" as something that comes from a "caller," just like a traditional voice call does. *See* 47 U.S.C. § 227(e)(8)(A) ("The term 'caller identification information' means information provided by a caller identification service regarding the telephone number of, or other information regarding the origination of, a call made using a voice service or a text message sent using a text messaging service."). The natural takeaway is that section 227(e)(8) identifies two different types of calls—voice calls and text messages—both of which originate with a "caller" and therefore require "caller identification." And unlike Sweet Emmaline's interpretation, that reading of section 227(e)(8) accords with the meaning of "call" as that word is used elsewhere in the TCPA.

The statute's definition of "text message" also does not provide any support for Sweet Emmaline's argument that "telephone call" excludes "text message." But all that definition

shows is that Congress limited the term "text message" to exclude some types of "telephone calls." That doesn't conflict with Plaintiff's argument that "telephone call" is a broad term that encompasses "text messages."

**D. Any doubt that section 227(c) covers text messages should be resolved by deference to the FCC's longstanding interpretation.**

The best reading of the statute is that the word "call" includes texts. But if there's any doubt about that, the FCC's interpretation should resolve it. That's because Congress expressly delegated authority to the FCC to "fill up the details" of the Do Not Call List rules. *Loper Bright*, 603 U.S. at 395. As a number of district court have held post-*Loper Bright*, section 227(c) "explicitly delegates such authority." *Skopos*, 2025 WL 2029274, at *4; *see Mey* v *Liberty Home Guard, LLC*, 2026 US Dist LEXIS 739, at *15, *19 (explaining section 227(c) "expressly delegated rulemaking authority" such that even "[u]nder *Loper Bright*," the FCC's interpretation is entitled to "deferential review"). So the FCC's longstanding reasonable interpretation of the word "call" should still carry the day. *See id*.

To be sure, mere statutory ambiguity is no longer automatic cause to defer to an agency. *See Loper Bright*, 603 U.S. at 412–13 (overruling *Chevron*). And district courts are not bound by the Hobbs Act to adopt FCC interpretations; they can and should make their own assessment of the statute. *See McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 152 (2025). Sweet Emmaline says this means no "deference" is permitted, so courts can now ignore the FCC's longstanding interpretation and act as if the FCC has no "persuasive authority." ECF 8-1 at 27–31. But that's incorrect.

Sometimes "the best reading of a statute is that it delegates discretionary authority to an agency." *Loper Bright*, 603 U.S. at 395. Courts thus still afford deference to agency interpretations when a statute "expressly delegate[s] to an agency the authority to give meaning

22

to a particular statutory term," tasks an agency "to fill up the details of a statutory scheme," or tells an agency "to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility." *Id*. at 394–95. In that case, a court's role is merely to "fix[] the boundaries" of agency authority and ensure "reasoned decisionmaking" within them. *Id.* at 395; *see Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587–88 (6th Cir. 2025).

Section 227(c) is an express delegation of that sort. Congress didn't write the Do Not Call List rules itself. Instead, it tasked the FCC with evaluating alternative approaches based on (among other things) open-ended criteria such as "effectiveness in protecting … privacy rights" and "other advantages and disadvantages." 47 U.S.C. § 227(c)(1)(A). And it empowered the FCC to make rules "that *the Commission determines* are most effective and efficient to accomplish the purposes of this section." 47 U.S.C. § 227(c)(1)(E) (emphasis added). That confers discretionary authority to "fill up the details," using open-ended language that bestows "flexibility" to best effectuate the TCPA's goals. *Loper Bright*, 603 U.S. at 395; *see Hulce*, 132 F.4th at 497 n.1 (noting the FCC's "delegated authority" to make Do Not Call List rules). In the telecommunications context, especially, an express delegation like this one is evidence that Congress expected technology "to evolve and therefore charged the [FCC] with the continuing obligation to define it." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 718 (D.C. Cir. 2016). It follows that, if the statute doesn't resolve this question, Congress expected that the FCC would.

It therefore would honor Congress's intent to "respect [that] delegation" and accept the FCC's "reasoned decisionmaking" on this question. *Loper Bright*, 603 U.S. at 395, 413. Exercising its expressly delegated authority, the FCC has reasonably explained that prohibiting texts to numbers on the Do Not Call List "make[s] … enforcement easier" and "eliminate[s] any potential confusion in the industry." 38 FCC Rcd. at 12256–57 ¶¶ 26–27 & n.59. That conclusion

23

aligns with the FCC's determination that cell phone numbers may be listed, and that the word "call" confers protection from unwanted text messages in other TCPA contexts. *Id.* ¶ 27. Moreover, the FCC has consistently adhered to that understanding of the word "call" for more than two decades, dating back to the earliest years of the technology, when text messaging first became common. *See* 18 FCC Rcd. at 14115 ¶ 165 (July 3, 2025); 30 FCC Rcd. at 8020 ¶¶ 115–16 (July 10, 2015); *Hernandez*, 2018 WL 6830220, at *1 ¶ 3 (Dec. 21, 2018). That conclusion is "reasonable and reasonably explained," and therefore warrants deference. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025).

Indeed, as Sweet Emmaline acknowledges, back when *Chevron* applied, courts often deferred to the FCC's judgment about the meaning of "call" in the TCPA. *See, e.g.*, *Satterfield*, 569 F.3d at 954 (granting the FCC *Chevron* "deference to hold that a text message is a 'call' within the TCPA"); *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 269 n.2 (3d Cir. 2013) (following *Satterfield*). After *Loper Bright*, there are many cases where agencies' reasonable decisions are no longer entitled to deference, but this is not one of them. The FCC's judgment about the status of text messages under its rules is as worthy of deference now as it was then. *Skopos Fin.*, 2025 WL 2029274, at *4.

Alternatively, the FCC's interpretation should—at the very least—be accorded "great weight." *Loper Bright*, 603 U.S. at 388. The FCC's position is grounded in the agency's expertise, consistent across decades, and well-reasoned. Those are the hallmarks of agency action with the "power to persuade." *Id.*; *Skidmore v. Swift Co.*, 323 U.S. 134, 140 (1944). The FCC's longstanding and consistent interpretation of the word "call" is thus an "informed judgment" to which this Court can "properly resort for guidance." *Loper Bright*, 603 U.S. at 388 (quoting *Skidmore*, 323 U.S. at 139–40); *see Esquivel v. Mona Lee, Inc.*, 2025 WL 3275607, at *3

24

(S.D. Cal. 2025); *Medvidi*, 2025 WL 2856295, at *3 (accepting the FCC's interpretation as evidence of "the plain meaning of the statutory text as it has been understood by consumers, the FCC, and courts since the TCPA's passage").

**Conclusion**

For decades, the FCC, federal courts, and Congress itself have operated on the understanding that text messages are calls under the TCPA. That understanding accords with the ordinary meaning of the statute's text, the historical telecommunications landscape against which Congress legislated, the structure of § 227, and the privacy-protective purpose of the Do Not Call Registry. Sweet Emmaline's contrary interpretation would create atextual distinctions within the statute, sever the private right of action from the very regulations it was enacted to enforce, and exclude from TCPA protection the precise type of unwanted telemarketing communications that Congress sought to prevent. Because Plaintiff plausibly alleges repeated telemarketing text messages sent to a number registered on the National Do Not Call Registry, the Complaint states a claim upon which relief may be granted. The Motion to Dismiss should therefore be denied in its entirety.

Dated: June 9, 2026        PLAINTIFF, on behalf of herself
and others similarly situated,


By: */s/ Anthony Paronich*
Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

25